# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cr-00001-JCM-BNW |
| Plaintiff, | |
| v. | **AMENDED REPORT AND RECOMMENDATION** |
| ELIJAH SYLEE SHELTON, | |
| Defendant. | |

**On August 14, 2024, the Court issued a Report and Recommendation regarding Elijah Shelton's Motion to Suppress along with ancillary motions that may be rendered moot by its resolution. ECF No. 57. The Court enters this Amended Report and Recommendation to correct a clerical error (ECF No. 57 at 14:25) that referred to Det. Diaz rather than Det. Perez. The error does not affect the Court's findings. The Amended Report and Recommendation follows:**

Before the Court is Elijah Shelton's Motion to Suppress, which seeks to exclude evidence uncovered by searches of his apartment and his girlfriend's car. ECF No. 29. Because officers did not reasonably identify Shelton as the passenger before stopping the car, they lacked reasonable suspicion for the stop, which amounted to an unconstitutional seizure. Based on the illegal stop, Shelton has standing to seek suppression of evidence found during the car's search as fruit of the poisonous tree. And given the close causal connection between the illegal stop and later search of the car, coupled with the Government's failure to assert an applicable exception, the Court recommends granting Shelton's Motion in part, excluding evidence seized from the car as "fruit" of the unlawful stop.

But because evidence establishes that officers merely committed typos on documentation and did not search the apartment until after the search warrant issued, the Court recommends denying the Motion with respect to the evidence discovered in Shelton's apartment.

1
2
3

The Court also recommends denying Shelton's Motion to Dismiss (ECF No. 28) and the Government's Motion to Hold in Abeyance (ECF No. 32) as moot based on the Court's recommendation that the gun found during the car's search be suppressed.

4

## I.     BACKGROUND

5
6
7
8
9
10

On January 3, 2024, Shelton was charged with two counts of possession with intent to distribute a controlled substance along with possession of a firearm by a prohibited person. *See generally* ECF No. 1. After the Ninth Circuit found the felon-in-possession statute—18 U.S.C. § 922(g)—unconstitutional in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), Shelton moved to dismiss his gun charge. ECF No. 28. In response, the Government moved to hold the motion in abeyance in light of the Ninth Circuit's grant of a rehearing en banc. ECF No. 32.

11
12
13
14
15
16
17

Around the same time, Shelton also moved to suppress drugs found in his apartment as well as a gun found in his girlfriend's car. ECF No. 29. Because Shelton seeks suppression of the gun, the Motion to Suppress, Motion to Dismiss, and Motion to Hold in Abeyance are related insofar as resolution of one may moot the others. The parties fully briefed the issues, and the Court held an evidentiary hearing. ECF Nos. 29; 40; 44; 48. At the Court's direction, the parties submitted supplemental briefing following the hearing. ECF Nos. 53; 55; 56. Trial is presently set for October 7, 2024. ECF No. 50.

18

## II.    EVIDENTIARY HEARING TESTIMONY

19
20
21

The Court held an evidentiary hearing on July 9, 2024. ECF No. 44. The Court heard argument from both parties and each presented evidence. *See id.* The Court summarizes the pertinent evidence and, where relevant, makes credibility determinations below.

22

### A.  The Investigation

23
24
25

Det. Nicholas Perez was the primary case agent on Shelton's case. ECF No. 52 at 16:20–21. He was assigned, at the time, to the Vice Section's Southern Nevada Human Trafficking Task Force, which investigates matters related to sex trafficking and pandering. *Id.* at 16:4–19.

26
27
28

In June 2023, Det. Perez was put in touch with Victim 1,[1] a Fremont Street showgirl, after his sergeant received information from an advocacy group called "Hookers for Jesus." *Id.* at 16:23–17:10. During her interview, she told Det. Perez that, after watching an online video describing the signs of sex trafficking, she believed she was being solicited by Shelton. *Id.* at 17:20–23. She explained that she started a romantic relationship with Shelton after meeting in passing on Fremont Street where they both worked. *Id.* at 17:24–18:7. Soon after entering the relationship, Shelton asked her to engage in prostitution. *Id.* at 18:8–10. But after declining Shelton's proposition, he told her that she would instead have to pay him the money that she earned as a showgirl. *Id.* at 18:11–13. Sometime later, Shelton again asked her to engage in prostitution, but she declined. *Id.* at 18:14–15.

Victim 1 believed that Shelton's girlfriend, an Asian woman who went by "Diane" or "Ling Ling," worked for him as a prostitute. *Id.* at 26:3–9, 27:11–12. She also alleged that Shelton attempted to traffic a fellow showgirl, Victim 2. *Id.* at 28:3–17. She showed Det. Perez photos of Shelton, provided his address, and stated that he was on federal probation. *Id.* at 25:4–17, 32:3–7. Aside from the prostitution allegations, Victim 1 told Det. Perez that she lent Shelton $15,000—which she believed he used to purchase drugs to sell—and showed him a picture of the promissory note. *Id.* at 18:16–23, 22:9–18; Gov't Ex. B.[2] She then provided Det. Perez with screenshots of messages between her and Shelton where he was offering to sell her drugs.[3] ECF No. 52 at 19:10–12, 21:9–25; Gov't Ex. A. Finally, she noted that Shelton stashed his drugs in a cream-colored Cadillac when he knew that his probation officer was coming for a home visit. ECF No. 52 at 36:19–20:5.

After the interview, Victim 1 reached out to Det. Perez again because she said that Shelton threatened to hurt her if she contacted law enforcement or his probation officer. *Id.* at 23:10–25:1, 82:8–11, 86:21–23. In a screenshot, she claimed that Shelton told her, "No face no case," and that

---

[1] For privacy purposes, the Court refers to the investigation's participants as "Victim 1" and "Victim 2."

[2] The exhibits correspond to the parties' evidentiary hearing exhibits.

[3] The dates of these texts and accompanying transactions are unclear from the photos.

he could send his friend "Ace," who lived with him, after her. Gov't Ex. C. She also believed that his girlfriend, Diane, had a registered gun that Shelton could use. *Id.*

Prompted by the information Victim 1 shared, Det. Perez set up an interview with Victim 2 a few days later. ECF No. 52 at 28:17–20. This time, he was accompanied by Det. Daniel Diaz. *Id.* at 28:23–24. Victim 2 described Shelton as a tall black man with a darker complexion, dreads, and a thinner build. Gov't Ex. P at 9. She recounted visiting Shelton's apartment with Victim 1. ECF No. 52 at 29:15–16. She stated that they went to the apartment to buy drugs, and that Victim 1 warned her in advance that Shelton would try to solicit her. *Id.* at 29:16–20. Victim 2 claimed that while Victim 1 went to a back room to grab drugs, she sat in the living room with Shelton, an Asian woman named "Ling Ling," and a few others. *Id.* at 29:22–25, 31:24–25. She alleged that Shelton asked her to work for him as a prostitute, offered her financial assistance, and threw a large wad of cash on the table. *Id.* at 30:1–11. She explained that "Ling Ling," while rubbing Shelton's feet, then asked her if she wanted to perform oral sex on Shelton, who she referred to as "Daddy." *Id.* at 30:13–16. Throughout this interaction, many people briefly stopped by the apartment for what Victim 2 believed to be drug deals. *Id.* at 30:23–31:8.

Following the interviews, Det. Perez verified Shelton's name and probation status through the SCOPE database system, which also provided a photo. *Id.* at 25:18–24. He then reached out to U.S. Probation Officer Brianna King to corroborate Shelton's address and confirm that his phone number matched Victim 1's texts. *Id.* at 32:15–33:3. P.O. King confirmed that the information matched with what she had on file and shared that Shelton's girlfriend, Diane Bouatay, lived with him. *Id.* at 33:4–16. After speaking to P.O. King, Det. Perez believed the Asian woman described by both victims as "Diane" or "Ling Ling" to be Bouatay. *Id.* at 35:18–36:7.

Once Det. Perez believed he had probable cause to arrest Shelton, he enlisted Det. Diaz to help conduct surveillance at his apartment. *Id.* at 33:22–34:2. On the morning of surveillance, Det. Perez briefed Det. Diaz about Shelton's criminal history and other details of the investigation, including Shelton's association with the cream-colored Cadillac. *Id.* at 36:11–18. He showed Det. Diaz Bouatay's DMV photo along with pictures of Shelton. *Id.* at 35:11–18. Det. Perez did not testify which photos of Shelton, or how many, he included in the safety brief. *See id.* at 35:11–14.

1    And Det. Diaz could not recall the nature of the photos or how many he had seen—he just

2    remembered that Det. Perez showed him a "workup" of sorts that would have included a photo. *Id.*

3    at 129:10–23, 133:7–15.

4        **B.  Surveillance**

5        On June 29, 2023, Dets. Perez and Diaz stationed themselves in unmarked cars outside

6    Shelton's apartment to conduct surveillance.[4] ECF No. 52 at 43:10–11. Det. Perez testified that he

7    developed probable cause to arrest Shelton for two counts of pandering. *Id.* at 33:23–24. The plan

8    was to do a "knock and talk," in which they would ask Shelton to leave his apartment, and once

9    outside they would arrest him. *Id.* at 34:10–20. The officers split up, with Det. Perez parking his car

10   at the "front" of Shelton's apartment within a cul-de-sac, and Det. Diaz stationing himself in the

11   rear alleyway. *Id.* at 38:17–39:2, 105:18–25. While driving down the alleyway, Det. Diaz noticed a

12   cream-colored Cadillac parked outside the apartment, which he recalled from the safety brief. *Id.* at

13   106:1–5. Next to the cream-colored Cadillac was a red BMW,[5] which Det. Diaz drove slowly past

14   before looping back around and parking a few spots away. *Id.* at 106:5–12. Det Diaz parked with

15   the back of his car facing the apartment and the front facing the alleyway. *Id.* at 109:1–3. He

16   testified that he stared long enough as he passed by, so he was able to see that the red BMW's

17   driver was an Asian woman. *Id.* at 106:5–12, 109:19–21.

18       From his parking spot, Det. Diaz could read the red BMW's license plate. *Id.* at 110:5–6. He

19   radioed Det. Perez that he saw an Asian woman in the red BMW and let him know that he was

20   running the plate. *Id.* at 43:19–44:9, 109:19–110:8. The records check showed that Diane Bouatay

21

22   [4] Because neither officer wore a body camera (*see* ECF No. 52 at 98:23–24, 128:13–14), it is
     unclear when surveillance began. While the Declaration of Arrest states that surveillance started

23   at 11:38 a.m. (Gov't Ex. P at 9), there is also testimony that Shelton was arrested around 11:40
     a.m. (ECF No. 52 at 100:9–11)—which the Court finds improbable given the events that took

24   place between the time that surveillance commenced, and the time Shelton was ultimately
     arrested.

25   [5] Prior to conducting surveillance that day, the officers knew nothing about the red BMW, as

26   neither victim mentioned it. ECF No. 52 at 97:1–2. Though P.O. King testified that she believed
     Shelton received rides from Bouatay, she could not recall anything about a red BMW. *Id.* at

27   146:20–21, 147:2–19, 152:3–9. Det. Perez also testified that he had never seen Shelton in the red
     BMW before. *Id.* at 74:21–25. And both officers said that they were unaware of Shelton ever

28   driving the car. *Id.* at 74:21–25, 128:7–12, 136:25–137:4.

was a registered owner of the car, along with someone else with the first name Champathon. *Id.* at 110:8–10, 124:17–18. Each officer testified that they did not know Champathon's gender, or what this person looked like. *Id.* at 91:8–19, 124:20–125:3. After receiving the license plate results, the officers had a conversation about Diane Bouatay where they confirmed that she was Shelton's girlfriend or someone who was living with him.[6] *Id.* at 110:14–23.

**C. The Stop of the Red BMW**

During the officers' conversation about the red BMW and what the records check showed, Bouatay left in the red BMW.[7] ECF No. 52 at 109:18–19. "Shortly after," the car returned. Gov't Ex. P at 10. Det. Diaz was positioned with his car backed into a parking spot, facing the alley. *Id.* at 109:1–3. Thus, when the red BMW returned, Det. Diaz was positioned closest to the driver's side of the red BMW. *Id.* at 111:24–112:1. Det. Perez testified that as the red BMW was approaching Det. Diaz interjected with a high-pitched voice, yelling, "I got him, I got him! I got him at gunpoint!" *Id.* at 45:11–14. Det. Diaz confirmed that he was experiencing an adrenaline spike because everything happened fast. *Id.* at 112:12–17.

Later during the day of the arrest, Det. Perez spoke with Det. Diaz about his observations so that he could incorporate them into his report. *Id.* at 65:18–66:4. The Declaration of Arrest states that Det. Diaz saw "the passenger seat reclined all the way back barely observing Shelton." Gov't Ex. P at 10. But at the evidentiary hearing, Det. Diaz testified that through the windshield he "clearly" saw "Shelton" reclined back in the seat. ECF No. 52 at 112:1–3. He also stated that he knew that the passenger was the guy they were looking for based on seeing a picture of Shelton during the safety brief. *Id.* at 112:3–7. Det. Diaz confirmed that the Declaration of Arrest, prepared by Det. Perez, included Det. Diaz's observations because he was the only one there at

---

[6] Det. Diaz also testified that he believed Det. Perez was communicating with P.O. King to determine where Shelton might be. ECF No. 52 at 109:22–25. Neither Det. Perez nor P.O. King testified regarding whether this conversation did in fact take place. Det. Perez testified that he could not remember whether he spoke with P.O. King on the day of the arrest or had spoken to her earlier in the week. *Id.* at 94:10–16.

[7] As discussed further below, the statement in the Search Warrant Declaration that Det. Diaz saw both Bouatay and Shelton leave in the red BMW was incorrect.

the time. *Id.* at 130:25–131:11. Det. Diaz also confirmed that the Declaration of Arrest indicated that he "barely" saw the passenger, who was reclined all the way back. *Id.* at 131:18–22.

The red BMW's windows were tinted. *See* Def. Exs. K-1–3. When officers later took photos of the car, the front windows were rolled down. *See id.* Both detectives testified that they themselves did not roll down the windows and that they had not seen any other officers do so either. ECF No. 52 at 53:10–13, 117:9–22. Shelton challenged the notion that windows would have been rolled down, eliciting evidence that it was summer in Las Vegas and confirming that officers had air conditioning on in their cars. *Id.* at 92:17–93:1.

Det. Diaz testified that after he radioed Det. Perez alerting him that he "got" Shelton, he pulled his car perpendicular to the red BMW in a blocking fashion so that if it was not parked or tried to leave, he could prevent it from escaping. *Id.* at 113:12–17. He explained that he would not use a "blocking" technique unless he knew who was in the car, because being incorrect would blow his cover. *Id.* at 120:7–121:3. He said that he approached the car with his gun aimed at Shelton and ordered him to show his hands and exit the car. *Id.* at 114:13–19. Det. Diaz testified that, at that point, Shelton went from his leaned-back position to leaning forward, "so now [he] can see him." *Id.* at 114:24–25. He stated that Shelton hunched forward, reached under the seat as if he was trying to hide something, and exited the car. *Id.* at 114:25–115:12. He then placed Bouatay and Shelton in handcuffs, at which point he positively identified Shelton.[8] *Id.* at 115:15–16, 118:10–12.

When Det. Perez arrived, he observed Det. Diaz approaching the red BMW with his gun drawn. *Id.* at 46:7–9. He drove around to the driver's side to assist. *Id.* at 46:10–12. The officers then froze the premises and called in backup. *Id.* at 50:10–13. According to bodycam footage, backup arrived around 11:45 a.m., and both Shelton and Bouatay can be seen in handcuffs. Gov't

---

[8] Both detectives testified that the term "positively identify" refers to confirming someone's identity through checking their ID, or running a records check based on their stated name. ECF No. 52 at 53:16–54:6, 118:10–119:4. Det. Perez stated that officers can identify people before "positively" identifying them based on conducting surveillance, observing what someone looks like in comparison to photos, determining whether they are entering known cars or residences, and seeing them with known associates. *Id.* at 55:5–56:11.

1  Ex. Q at 18:45:24.[9] Det. Perez testified that immediately after Shelton and Bouatay were taken

2  into custody, three to five people came out of the apartment complex yelling to give them the car

3  and trying to take the keys. ECF No. 52 at 57:1–21. Based on what they were yelling, he believed

4  them to be family members of Bouatay or Shelton. *Id.* at 57:6–10. Both officers testified that the

5  people were not helpful. *Id.* at 58:25–59:1, 121:23–122:24.

6      At 11:46 a.m., Det. Perez leaned into the red BMW and reached inside. Gov't Ex. Q at

7  18:46:24. He testified that he wanted to ensure that Shelton's apartment keys were in the car so

8  that no one could get into the house, and that he also contemplated removing the red BMW's keys

9  to prevent people from taking it. ECF No. 52 at 98:15–99:2. He did not, however, take anything

10  out of the car. *Id.* at 99:13–15.

11     **D. The Search Warrants**

12     Det. Perez applied for a telephonic search warrant at 1:29 p.m.[10] Gov't Ex. K at 1. The

13  search warrant requested to search the apartment, the cream-colored Cadillac, and the red BMW

14  for guns, money, drugs, and items related to pandering. *Id.* at 2. During the phone call, Det. Perez

15  recounted the victims' statements, along with the information he verified with P.O. King, and

16  described the officers' surveillance. *Id.* at 3–6. His affidavit stated that Det. Diaz watched Shelton

17  and Bouatay both leave and return in the red BMW and that they had been stopped. *Id.* at 5. He

18  then confirmed that all the premises were frozen. *Id.*

19     The judge found that there was probable cause for the search warrant to issue, and Det.

20  Perez concluded the call, stating that it was 2:42 p.m.[11] *Id.* at 6–7. The Duplicate Originals, which

21  Det. Perez filled out when he was on the phone with the judge, also indicated that the warrant

22  issued at 2:42 p.m., though they were dated ***July*** 29, 2023. Gov't Ex. P at 32; ECF No. 52 at

23  69:7–24.

24

25

26  [9] The bodycam footage time stamps, as displayed in the upper right-hand corner of the videos, are in Zulu Time, which is offset Pacific Daylight Time by seven hours.

27  [10] The Search Warrant Declaration, the Duplicate Originals, and Search Warrant Returns use military time which, in this instance, would correspond to 1329 hours.

28  [11] This corresponds to 1442 hours military time.

Officers entered Shelton's apartment at 1:49 p.m. and began searching. Def. Ex. F at 20:49:16. During the search, they uncovered various types of drugs, most of which were hidden in the ventilation system. Gov't Ex. P at 14–15. Sometime later, officers searched the red BMW.[12] Def. Ex. X at 20:53:12. From this, they discovered drugs, cash, and a gun,[13] along with a folder containing Shelton's personal documents.[14] Gov't Ex. P at 10; Def. Exs. L-1–3. The Search Warrant Returns, which inventory the officers' findings, all state that the searches were executed on June *28*, 2023. Def. Exs. G; H; I.

The Search Warrant Declaration, which is a transcription of the phone call between Det. Perez and the judge, spans seven pages. Gov't Ex. K at 1–7. The audio recording of the call lasts a little over 13 minutes. Gov't Ex. L. At the hearing, Det. Perez testified that the transcriptionist made an error when he wrote that Det. Perez concluded the call at 2:42 p.m. ECF No. 52 at 67:22–24. He noted that although he reviewed the transcript, he should have done a better job because he did not catch the error. *Id.* at 67:17–20. In the audio itself, Det. Perez states that the time at the conclusion of the telephonic warrant application is 1:42 p.m. Gov't Ex. L at 13:15.

Det. Perez also acknowledged that he made a mistake—as to both the date and time—when he filled out the Duplicate Originals. ECF No. 52 at 69:16–24. He attributed his error in putting the incorrect month to the fact that both June and July start with the letter "J," and explained that he wrote the incorrect time because he is "not too good" with military time, which he does not use in his private life. *Id.* at 69:25–70:6.

Det. Perez then explained that he had incorrectly told the judge during the telephonic warrant application that Det. Diaz observed both Shelton and Bouatay leaving and returning in

---

[12] The exact time that the search of the red BMW began is unclear, as it was not directly captured on bodycam footage. However, what is likely the search—given that the car's trunk is open—can be seen in the background of footage around 1:53 p.m. Def. Ex. X at 20:53:12.

[13] Shelton's case agent, Mason Roush-Wallace, testified that the metadata from the photos of the red BMW's search indicates that they were taken at 1:33 p.m. ECF No. 52 at 162:18–163:3. However, he admitted that if a camera's programmed time is wrong, the metadata also would be incorrect. *Id.* at 165:7–9. Christopher Dinh, the photographer, testified that he used his personal camera to take pictures of the evidence and that upon checking his camera, the time was "slower." *Id.* at 167:23–24, 168:12–16. He also testified that he would not take pictures before a search warrant was approved. *Id.* at 172:12–22.

[14] The folder included a letter, a subpoena, and medical records. Def. Exs. L-1–3.

the red BMW, when in reality, Det. Diaz only saw Bouatay when the car left. *Id.* at 64:19–23.

Det. Perez stated that when he initially spoke to Det. Diaz, he misunderstood him to say that

when the red BMW left Shelton was observed in it alongside the driver and did not realize his

error until he spoke to Det. Diaz again later that day while verifying information to prepare his

report. *Id.* at 65:1–24.

Sgt. Leung also testified that although he supervised the searches and their inventory, he

did not sign, date, or fill out the Search Warrant Returns. *Id.* at 156:11–21. The returns, he stated,

were filled out by Det. Catherine Hui. *Id.* at 157:6–9. He acknowledged that Det. Hui wrote the

incorrect date on all three returns. *Id.* at 157:21–158:16.

## III.    BRIEF SUMMARY OF THE PARTIES' ARGUMENTS

Shelton seeks suppression of the evidence discovered in the red BMW's search because he

contends that officers did not have reasonable suspicion to seize him and that the search of the red

BMW was fruit of the illegal seizure. The Government takes the position that there was

reasonable suspicion to support the seizure and also disputes Shelton's standing to challenge the

search of the red BMW. But Shelton maintains he can challenge evidence discovered during the

search as fruit of the illegal stop and that, in addition, he has a possessory interest in the car.

Lastly, regarding the red BMW, Shelton advances the argument that the search took place before

the warrant issued. The Government disputes this, and, in any event, argues the search of the red

BMW would have also been permissible under the automobile exception.

Shelton's argument that the search took place before the issuance of the warrant also

applies to the search of his apartment. The Government again disputes this notion.

The Court discusses each of the issues, and a more detailed version of the parties'

corresponding arguments, below.

## IV.    ANALYSIS

### A.  Reasonable Suspicion to Stop the BMW

The Fourth Amendment prohibits "unreasonable searches and seizures" by the

Government, and its protections extend to brief investigatory stops of persons or vehicles. *Terry*

*v. Ohio*, 392 U.S. 1, 9 (1968). An officer may stop a car with reasonable suspicion that a person

1  inside "has committed, is committing, or is about to commit a crime." *United States v. Lopez-*

2  *Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439

3  (1984)). An officer may not, however, rest only upon intuition. *United States v. Cortez*, 449 U.S.

4  411, 417 (1981). Reasonable suspicion, rather, "is formed by specific, articulable facts which,

5  together with objective and reasonable inferences, form the basis for suspecting that the particular

6  person detained is engaged in criminal activity." *United States v. Rojas-Millan*, 234 F.3d 464,

7  468–69 (9th Cir. 2000). In weighing the specific and objective facts, courts look to the totality of

8  the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

9       "Of course, a traffic violation is not the only lawful basis for an officer to conduct a

10  vehicle stop." *United States v. Nault*, 41 F.4th 1073, 1079 (9th Cir. 2022). "[I]f police have a

11  reasonable suspicion, grounded in specific and articulable facts," that a person is wanted for a

12  completed crime, they may conduct a *Terry* stop of the car "to investigate that suspicion." *United*

13  *States v. Hensley*, 469 U.S. 221, 229 (1985). This can include suspicion that a person in the

14  vehicle is the subject of an outstanding arrest warrant.[15] *Nault*, 41 F.4th at 1079 n.3 (collecting

15  cases). It is critical, however, that "the facts justifying the stop must be known to the officers at

16  the time of the stop." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016).

17       Shelton argues officers did not have reasonable suspicion to stop the red BMW because

18  Det. Diaz did not observe the car commit a traffic violation and did not know that Shelton was in

19  the car prior to the stop. ECF No. 29 at 9–12. He contends that Det. Diaz barely observed the red

20  BMW's passenger reclined all the way back in a car with tinted windows. *Id.* And because Det.

21  Diaz did not see Shelton in the red BMW when it left, and the officers had no information

22  connecting the car to him or any crime, Shelton asserts that they did not have reason to believe

23  that he was in the car when it returned. *Id.*; ECF No. 56 at 3. Thus, he argues, Det. Diaz did not

24  know that Shelton was the passenger until after he stopped the car and had already impermissibly

25  seized the people inside. *Id.*

26

27  ---
[15] Here, officers did not have an arrest warrant for Shelton. However, Dets. Perez and Diaz

28  testified that they were conducting surveillance to make a probable cause arrest for two counts of
pandering. Shelton does not dispute that officers had probable cause to arrest him.

The Government asserts that Det. Diaz was able to observe Shelton in the front seat from his vantage point, and that he was able to identify him as the person they were there to arrest because he had seen pictures of Shelton before. ECF Nos. 40 at 8–7; 55 at 7. In this vein, the Government argues, the officers exceeded the "low reasonable suspicion threshold for police to *Terry* stop Shelton to confirm" his identity. ECF No. 55 at 5–7. Besides recognizing him as the passenger, the Government argues officers knew Shelton had a girlfriend who was an Asian woman named Diane, who lived with him, and who was the registered owner of the red BMW, which was ultimately stopped in an alley behind the apartment where Shelton and Bouatay both lived.[16] *Id.*

Though the Government points to many previously known facts surrounding Shelton's alleged crimes as justification for the stop, the fact that officers had probable cause to arrest Shelton is not sufficient to establish that they knew the person they were stopping was indeed Shelton. As the Sixth Circuit explained in the analogous context of police executing an arrest warrant:

> The existence of an arrest warrant is of no moment on the question whether a particular person police officers come across is in fact the subject of the warrant. The warrant supplies the officers with probable cause to arrest the person it names and describes, not a license to duck the reasonable suspicion requirement and stop someone they only have a subjective hunch is that person.

*United States v. Hudson*, 405 F.3d 425, 438 n.9 (6th Cir. 2005). Thus, officers could not arrest Shelton "by any means" simply because they had probable cause to arrest him. *Id.* at 435 (citing *Hensley*, 469 U.S. at 223–34). Instead, "reasonable suspicion to stop a person, whether suspected of a past or ongoing crime, must rest on specific facts—available to the officers *before* they initiate contact—tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation." *Id.* at 438 (emphasis in original). The issue here, therefore, is whether officers had specific facts to support the conclusion that Shelton was the

---

[16] The Government also contends that the automobile exception applies because police had probable cause to arrest Shelton for pandering, and they had reason to believe that evidence of his crimes was in the car. ECF No. 40 at 6–8. The Court will address this issue further below, as the automobile exception relates to the search, and not the initial seizure, of the vehicle.

passenger in the red BMW when it returned to the apartment around 11:40 a.m. on June 29, 2023. *See id.* at 432.

Here, the Court agrees that officers had reasonable suspicion to believe Bouatay was driving the red BMW. That is because with regard to Bouatay, there were articulable facts that supported that conclusion. Det. Diaz had time to drive slowly past the red BMW, observe the driver, loop back around to park a few spots away, read the license plate, radio his observations to Det. Perez, run the plate, and receive the results of the search. He confirmed that Diane Bouatay was one of the registered owners. Both victims told detectives that Shelton's girlfriend was an Asian woman named Diane or "Ling Ling." The officers confirmed with P.O. King that Bouatay lived with Shelton, at which point Det. Perez believed Bouatay to be the same person the victims described. And before initiating surveillance, Det. Perez showed Det. Diaz Bouatay's DMV photo. The officers also knew, from Victim 1, that Shelton allegedly stashed drugs in a cream-colored Cadillac before home visits. And Det. Diaz observed an Asian woman parked outside Shelton's apartment next to a cream-colored Cadillac. The same cannot be said regarding his observations of the passenger upon the red BMW's return.

Before conducting surveillance that day, the officers had no knowledge of the red BMW or what its connection to Shelton may be. Unlike the apartment and the cream-colored Cadillac, the victims made no mention of the red BMW to detectives. Though P.O. King testified she was aware that Shelton received rides from his girlfriend, she did not know that Bouatay drove a red BMW or that it was otherwise associated with Shelton. Regardless, neither officer indicated that P.O. King shared this information with them, and Det. Perez confirmed that he had never seen Shelton riding in the red BMW.

The fact that Shelton and Bouatay were in a relationship and Bouatay was returning to Shelton's apartment is not enough to suggest that Shelton was in the car at that given moment. Although Det. Diaz hinted that Det. Perez attempted to learn Shelton's location from P.O. King prior to the red BMW's return, Det. Perez did not testify to that conversation or the outcome of such inquiry, and neither did P.O. King. So, it is unclear whether P.O. King knew anything about

1    Shelton's whereabouts, or whether she relayed such information to the officers and if she did,

2    when.

3           The officers also could not assume Shelton's identity from the mere presence of a

4    passenger in Bouatay's car. She too lived in the apartment and could have been accompanied by

5    any number of different passengers. By way of example only, both victims told detectives that

6    people frequented the apartment, Victim 1's text to Det. Perez indicated that someone named

7    "Ace" lived with Shelton, and the detectives did not know what the car's other registered owner,

8    Champathon, looked like.

9           But most importantly, the Court is not persuaded that Det. Diaz's observations allowed

10   him to reasonably identify Shelton before he stopped the car. Det. Diaz was not the primary case

11   agent, so he did not have the same familiarity with Shelton as Det. Perez. Because he was present

12   for Victim 2's interview, the Court can infer that he knew, as Victim 2 described, that Shelton

13   was a tall black man, with a darker complexion, dreads, and a thinner build. However, Det. Diaz

14   could not remember how many photos he was shown of Shelton, and what the nature of the

15   photos were, be it social media photos, a booking photo, or a DMV-type photo. Det. Perez too did

16   not testify as to which photos he included in the workup for the safety brief. And neither officer

17   testified as to how much time had elapsed between the safety brief and their surveillance.

18          Of note, when recounting his observations of the passenger, Det. Diaz did not describe

19   what exactly he saw that allowed him to identify the passenger as Shelton. That is, he did not

20   describe the passenger's appearance or state that he observed certain features that matched the

21   picture(s) he has previously seen. Along these same lines, he did not provide an explanation of

22   what he was looking for based on the photos he was shown, or the description he was provided by

23   Victim 2 or Det. Perez. Instead—in direct contradiction to what was written in the Declaration of

24   Arrest on the day of the event—he simply stated that he "clearly" saw "Shelton" through the

25   windshield and knew that it was him based on photos he had seen.

26          At no point did Det. Diaz attempt to reconcile his contradictory testimony with the

27   Declaration of Arrest's description, which states that he "barely" observed Shelton "with the

28   passenger seat reclined all the way back." To be sure, Det. Perez wrote the description—not Det.

Diaz. But Det. Diaz confirmed that the Declaration of Arrest recounted his observations because he was the only one who observed the red BMW's return. Neither officer contended that the Declaration of Arrest misrepresented Det. Diaz's observations or that it included errors. Indeed, Det. Perez testified that before he prepared the Declaration of Arrest, he verified what information would be included in it with Det. Diaz. It was at that point that Det. Perez realized that the Search Warrant Declaration incorrectly stated that Bouatay and Shelton had both been observed leaving and returning in the red BMW. This constitutes additional evidence that the Declaration of Arrest contained accurate information regarding Det. Diaz's observations. This, his failure to explain such a stark discrepancy, and the fact that Det. Diaz's day-of recollection is more likely to be accurate than what he remembers over a year later, account for the reason why the Court cannot credit this testimony.

Moreover, after examining the totality of the circumstances, the Court finds that the situation more likely comports with how it was described in the Declaration of Arrest. Based on the timing of events, the return and stop of the red BMW happened very quickly. Shortly after Det. Diaz ran the license plate, his conversation with Det. Perez was interrupted by the BMW's return. Det. Diaz, in turn, did not have much time to observe the passenger. Indeed, he was positioned more closely to the driver's side of the car. And though it is likely that the front windows were rolled down, the remaining windows were tinted, and Shelton was reclined all the way back. This set of facts is more consistent with the information that appears in the Declaration of Arrest: that Det. Diaz "barely" observed the passenger and that, despite his testimony, he did not "clearly" observe him.

Although Det. Diaz testified that he would not have used a "blocking" technique unless he knew Shelton was the passenger because it would blow his cover, the record as a whole does not support that conclusion. Instead, it appears more likely that, acting on an adrenaline spike, Det. Diaz had a "hunch" that the passenger was Shelton. In fact, he confirmed in his testimony that once he approached the stopped car, gun drawn and giving orders, Shelton shifted forward from his reclined position "so now [he] can see him."

1        But Det. Diaz was not permitted to "seize first and identify second." *Hudson*, 405 F.3d at

2  434. Though not required to "positively" identify Shelton, Det. Diaz needed to "at least

3  reasonably" identify him *before* stopping the red BMW. *Id.* A *Terry* stop must rest on more than

4  an "inchoate and unparticularized suspicion," *i.e.*, "a hunch." *Terry*, 392 U.S. at 27. And an

5  officer's "hope of finding a suspect at a particular location does not constitute a particularized and

6  objective basis for seizing, even temporarily, a vehicle and its occupants at that location."

7  *Hudson*, 405 F.3d at 438.

8        Case law confirms that officers who "seize first and identify second" do not have

9  reasonable suspicion for a stop. *Id.* at 434. For example, in *Hudson*, officers searching for the

10  subject of an arrest warrant received a tip that he would be accompanying a woman to her

11  workplace when she arrived to her 3:00 p.m. shift in a red Ford Taurus. *Id.* at 428. Believing from

12  their own investigation that the defendant and the woman were in a relationship, the officers

13  corroborated the woman's arrival time and the car she drove with her manager. *Id.* at 428–29.

14  They then waited in the parking lot and once the red Ford Taurus arrived, approached the parked

15  car with guns drawn and seized the driver and her passengers, who were two black men. *Id.* at

16  429.

17        The Sixth Circuit[17] held that the officers lacked reasonable suspicion because the record

18  showed that they "made no attempt to reasonably identify one of the passengers as [the

19  defendant] prior to initiating the *Terry* stop of the car." *Id.* at 438. The district court discredited

20  the officer's testimony that the tip included a prediction that the defendant would arrive to work

21  with his girlfriend because his report made no mention of this fact. *Id.* at 433. That portion of the

22  tip also was not corroborated by the woman's manager. *Id.* at 429. Thus, the Sixth Circuit

23  determined that "[r]easonably suspecting only that [the woman and the defendant] were once

24  romantically involved, and knowing that [the defendant] is black, the officers elected to stop the

25  car." *Id.* at 438. This, the court found, was "plainly insufficient to justify the *Terry* stop." *Id.*

26

27

28  [17] Though not binding on this Court, the out-of-circuit cases are factually analogous and therefore persuasive. Moreover, the reasonable suspicion legal standard across the circuits is the same.

The Second Circuit too found "no difficulty concluding that the officers acted unreasonably" when they stopped a car to "confirm or dispel their suspicions" that its driver was their suspect. *United States v. Swindle*, 407 F.3d 562, 569–70 (2d Cir. 2005). In *Swindle*, four officers in an unmarked car were on the lookout for a suspect wanted for dealing drugs. *Id.* at 564. Each of the officers was familiar with the suspect's appearance—both from encountering him in the past and from having his description. *Id.* When the police came across a black Pontiac Bonneville, a car the suspect had been seen "near" before, they started surveiling it. *Id.* They observed a black man enter a known drug house that the suspect previously supplied and exit a short time later but could not make out whether he was, in fact, the suspect. *Id.* "Believ[ing] him to be a black male fitting the description" of the suspect, the officers stopped his car. *Id.* at 569.

But the court emphasized that while the "officers certainly may have suspected" him to be the suspect, "the relevant question [was] whether that suspicion was reasonable." *Id.* And in finding that the driver was simply a black man in a car that may have been associated with the suspect, the court concluded that it was not. *Id.*

Central to these holdings is the recognition that (1) officers did not reasonably identify the people in the cars as the "subject" before stopping them, and (2) the remaining circumstances did not otherwise form a reasonable basis for officers to believe that particular person was in the car at that given time. Such is the case here. When officers began surveillance, they did not know whether Shelton was already home, or if he was away. Even assuming that he was away, they did not have any indication of when he might return. Though they had reasonably identified Bouatay, without first identifying Shelton as her passenger, the officers did not have reasonable suspicion that he was in her car at that moment. Det. Diaz may have been sufficiently aware of Shelton's appearance so as to reasonably identify him, but because he "barely" observed a passenger, reclined all the way back in a car with tinted windows, for what was likely just a moment, the Court cannot conclude that he did so before he stopped the car.[18]

---

[18] The Government relies on the automobile exception to justify the initial seizure. But the automobile exception allows for the search of a car (based on probable cause) without the need for a warrant only if the initial seizure was lawful. *See United States v. Sanchez*, 944 F.2d 497, 498 (9th Cir. 1991) ("a *legitimately stopped* automobile may be searched without a warrant if

1    Based on the totality of the circumstances discussed above, the Court concludes that

2    Shelton's Fourth Amendment rights[19] were violated when Det. Diaz stopped the red BMW

3    because he did not have reasonable suspicion that Shelton was the passenger.[20]

4    **B.  Standing to Challenge the Red BMW's Search**

5    The Government disputes Shelton's standing to challenge the search of the red BMW

6    because it contends that he does not have a possessory interest in the car. ECF Nos. 40 at 4–6; 55

7    at 8. Shelton asserts that he *does* have a possessory interest in the red BMW because his personal

8    items were found in the vehicle and Bouatay, his girlfriend, allows him to use the car. ECF

9    Nos. 44 at 8; 53 at 9. Nonetheless, Shelton argues, he can seek suppression of evidence from the

10   car as "fruit" of the illegal stop even if he lacks a possessory interest. *Id.* at 8; ECF No. 53 at 4–6.

11   But the Government counters that Shelton could only seek suppression of fruits from a "traffic"

12   stop, and cannot, as here, seek suppression of evidence flowing from a *Terry* stop.[21] ECF No. 55

13   at 1–4.

14   A passenger with no possessory interest in a car "has no reasonable expectation of

15   privacy. . . that would permit a Fourth Amendment challenge to a search of the car." *United*

16   *States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (citation and quotations omitted). But

17   because a stop of a car seizes everyone—and not just the driver—a passenger has standing to

18   _____

19   those conducting the search have probable cause to believe that there is contraband in the
     automobile" (emphasis added)). Because Det. Diaz did not have reasonable suspicion to stop the
     red BMW, the automobile exception cannot apply.

20   [19] The Court acknowledges that Det. Perez leaned into the red BMW before the search warrant
     was granted, but this fact does not affect the analysis on this issue.

21   [20] The Court's holding that the stop was unreasonable does not call into question the validity of

22   the probable cause and ultimate arrest of Shelton for pandering. "Where the police effectuate an
     arrest in an illegal manner but nonetheless have probable cause to make the arrest, the proper

23   Fourth Amendment remedy is to exclude only that evidence which is a fruit of the illegality."
     *Hudson*, 405 F.3d at 439.

24   [21] To the extent the Government argues that the stop was not a "vehicle stop" whatsoever, this

25   assertion is inconsistent with the record. Det. Diaz testified that he blocked the red BMW so that
     "if it wasn't parked or decided to leave" he could prevent it from escaping. Nonetheless, even a

26   *Terry* stop of a parked car is broadly considered a "vehicle stop" and, as discussed further below,
     is indistinguishable from a "traffic stop." *Nault*, 41 F.4th at 1078–79. A "stop" of a person *in a*

27   *vehicle* is a "vehicle stop" regardless of whether the car was moving or already parked. *See id.*

28   Shelton and Bouatay were indisputably inside the car when Det. Diaz approached them with his
     gun drawn and ordered them to exit the car.

challenge the stop. *Brendlin v. California*, 551 U.S. 249, 263 (2007). So when a passenger establishes that a stop violated the Fourth Amendment, the evidence seized as a result of that stop is subject to suppression as fruit of the poisonous tree. *Twilley*, 222 F.3d at 1095 (citation omitted); *see also United States v. Pulliam*, 505 F.3d 782, 788 (9th Cir. 2005) (confirming that both standing and causation principles are satisfied when a passenger challenges "evidence found in a vehicle search following an illegal stop").

Though some courts have used the more-specific language of "traffic stop" rather than the broader language of "vehicle stop" or simply "stop," there is nothing to suggest that a passenger can only seek suppression of evidence flowing from a *traffic stop*. In holding that a passenger has standing to challenge an illegal stop, the Supreme Court based its decision on the rationale that a passenger too is "seized" for Fourth Amendment purposes, irrespective of the type of seizure. *Brendlin*, 551 U.S. at 257–63. Although the *Brendlin* Court used the language "traffic stop," the opinion makes clear that its standing finding is not based on the *purpose* of the stop.[22] *Id.* at 260– 63. Rather, in concluding that a passenger is seized, the Supreme Court explicitly rejected a test that examined an officer's motivation for stopping a car in favor of the objective *Mendenhall* test, which simply asks whether a reasonable passenger would feel free to leave. *Id.* at 260 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Thus, it was not the fact that the stop was for a *traffic* violation that conferred standing on the passenger. *Id.* at 263.

This conclusion is also supported by Ninth Circuit precedents that do not discuss the distinction between traffic stops and investigatory stops when finding standing for passengers to challenge evidence as fruit of an illegal vehicle stop. *Twilley* itself does not use the language "traffic stop" but instead simply "stop" in its rationale. 222 F.3d at 1095 ("Twilley challenged the initial stop. . . Twilley has standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop" (citation and quotations omitted)). And *Pulliam* too—though it uses the

---

[22] The Supreme Court also explicitly referenced other types of vehicle stops in its opinion without recognizing any distinctions. *See, e.g.*, *Brendlin*, 551 U.S. at 257 n.3 ("Of course, police may also stop a car solely to investigate a passenger's conduct.").

language "traffic stop" at one point in the opinion—later merely uses the term "stop" in its

overarching rationale:

> Since officials cannot physically stop a car without seizing its passengers, a passenger who objects to the legality of a ***stop*** effectively is challenging the official act that caused a violation of his own rights. Thus, the standing principle is satisfied. Further, the causation principle is satisfied because evidence found in a vehicle search following an ***illegal stop*** ordinarily will be a product of that ***stop***.

505 F.3d at 788 (internal citations and quotations omitted) (emphasis added).

But more importantly, the Ninth Circuit recently declined to find a meaningful difference

between a traffic stop and a *Terry* stop in a similar context. In *Nault*, the court found that an

officer who stopped a parked car because its owner had an outstanding warrant did not

unreasonably prolong the stop under *Rodriguez* after he determined that the driver was not the

subject of the warrant. 41 F.4th at 1078–79 (citing *Rodriguez v. United States*, 575 U.S. 348

(2015)). In reaching its finding, the court disagreed "with the importance that the dissent

assign[ed] to the 'traffic stop' label." *Id.* at 1080. Citing *Brendlin*, the court noted that "[t]he

Supreme Court and this court have used 'traffic stop' to refer to investigative stops of drivers in

their vehicles for reasons other than observed traffic violations." *Id.* The Court then emphasized

that because "[t]raffic stops are analyzed under the same *Terry* principles that apply to

investigative stops," the analysis is the same "[w]hether described as a 'traffic stop' or an

'investigative vehicle stop.'" *Id.*

There is nothing to suggest that the Ninth Circuit would reach a different conclusion here.

The *Rodriguez* inquiry, as employed by the *Nault* Court, expressly examines the *purpose* of a stop

by determining the officer's "mission." *Rodriguez*, 575 U.S. at 355. Yet, the Ninth Circuit—even

in expressly considering the purpose of a stop—declined to recognize a material difference

between a traffic stop and a *Terry* stop. *Nault*, 41 F.4th at 1080. And in conferring standing on

passengers to challenge an illegal stop—and by extension, the fruits of the illegal stop[23]—the

---

[23] As further support for the notion, the Supreme Court favorably quoted a treatise that "share[s] the prevailing judicial view" in which only the language "stop" was used: "If either the ***stopping*** of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then ***surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is***

Supreme Court rejected a test that considered an officer's motivation for stopping a car. *Brendlin*, 551 U.S. at 260. So there is even more reason to believe that the Ninth Circuit would find such a distinction immaterial here. The Court therefore does not "see the salience of any distinction between a 'traffic stop' and an 'investigative stop' in this case." *Cf. Nault*, 41 F.4th at 1080.

A passenger has standing to challenge a car's search when a person was (1) unlawfully seized, and (2) there is a causal connection between the stop and the search. *Pulliam*, 405 F.3d at 788. Because Shelton was "seized"—regardless of whether it was a traffic or *Terry* stop—he has standing to challenge the illegal stop and seek suppression of the evidence found during the red BMW's search as fruit of the poisonous tree. The Court, therefore, need not determine whether Shelton has a possessory interest in the car.[24]

### C. Fruit of the Poisonous Tree

Because the officers lacked reasonable suspicion to stop the red BMW—and Shelton can challenge the fruits of the illegal stop—the Court must determine the appropriate remedy. The exclusionary rule applies to both the "primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality," or the so-called "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984).

The fruit of the poisonous tree doctrine "does not require a particularly tight causal chain" between the Fourth Amendment violation and the evidence sought to be suppressed. *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020). "Ordinarily, when a car is illegally stopped, the search that follows will be a product of that stop." *United States v. Arvizu*, 232 F.3d 1241, 1252 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 266 (2002). Because officers lacked reasonable suspicion to stop the red BMW, any evidence obtained from the search of the car must

---

*their fruit*." *Brendlin*, 551 U.S. at 259 (quoting 6 Wayne R. LaFave, *Search & Seizure* § 11.3(e) (4th ed. 2004)) (emphasis added).

[24] Because the Court does not determine whether Shelton has a possessory interest in the red BMW, it does not discuss whether Shelton can bring a *Franks* challenge to the search warrant (as applied to the red BMW).

1   be excluded as fruit of the poisonous tree unless the Government can assert an applicable

2   exception. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989).

3         "The government has the burden to show that the evidence is not the fruit of the poisonous

4   tree." *Twilley*, 222 F.3d at 1097 (citation and quotations omitted). Here, the Government has

5   made no effort to do so[25] and for that reason alone, an exception cannot apply. *Ngumezi*, 980 F.3d

6   at 1291 ("It is the government's burden to show inevitable discovery, so its failure to make the

7   argument prevents us from upholding the denial of the suppression motion on that theory."). The

8   Court therefore grants Shelton's Motion to Suppress with respect to the evidence seized from the

9   red BMW.

10        **D.  Search of the Apartment**

11        Shelton also seeks suppression of evidence found in the search of his apartment because

12  he contends that officers conducted the search before the warrant was issued. ECF No. 29 at 5–7,

13  13–14. He argues that while the Search Warrant Declaration and the Duplicate Originals indicate

14  that the warrant was not issued until 2:42 p.m., officers initiated the search at 1:49 p.m. *Id.* He

15  also notes that the Search Warrant Returns indicate that the searches took place the day prior. *Id.*

16        The Government responds that the time on the Search Warrant Declaration and the

17  Duplicate Originals is an obvious typographical error, which is reconciled by the length of both

18  the call's audio, which lasts only 13 minutes, and the transcript, which spans only seven pages.

19  ECF No. 40 at 12. The Government also notes that Det. Perez stated the correct time in the audio.

20  *Id.* As to the incorrect date on the Search Warrant Returns, the Government points out that

21  Shelton does not argue that officers searched both on June 28 and again the next day on June 29,

22  which indicates that this too was an error. *Id.* at 12 n.2. Thus, the Government asserts, the

23  evidence as a whole shows that the warrant issued at 1:42 p.m., *before* the officers entered the

24  apartment. *Id.* at 13.

25

26  [25] The Court notes that at the conclusion of the evidentiary hearing, it specifically directed the
    parties to provide supplemental briefing on the fruit of the poisonous tree doctrine and whether

27  the search of the red BMW flowed from the allegedly illegal stop. ECF No. 52 at 194:9–12 ("for
    purposes of briefing. . . assuming I find there's no reasonable suspicion for the seizure itself, what

28  flows from that.").

1    The Court agrees that the discrepancies are merely typos. Det. Perez can be heard on the

2    audio stating that the call concluded at 1:42 p.m. And even if Det. Perez noted the incorrect time

3    during the call, the length of the audio and the transcript of the audio establish that the call only

4    lasted about 13 minutes, as opposed to an *hour* and 13 minutes. Det. Perez also acknowledged

5    and explained his errors, noting that he miscalculated the military time, which he does not have

6    much familiarity with, and did not thoroughly review the transcriptionist's work. And because

7    Shelton does not contend that the searches were executed a day before the warrant was granted,

8    the incorrect date on the Search Warrant Returns too can be chalked up to a typo. Overall, the

9    testimony at the hearing supports the conclusion that the search did not take place prior to the

10   issuance of the warrant. Given the valid timing of the warrant and the search,[26] the Court denies

11   Shelton's Motion with regard to the evidence found in the apartment.

12   **V.    CONCLUSION**

13        **IT IS THEREFORE RECOMMENDED** that Shelton's Motion to Suppress (ECF

14   No. 29) is **GRANTED** in part and **DENIED** in part consistent with this Report and

15   Recommendation.

16        **IT IS FURTHER RECOMMENDED** that Shelton's Motion to Dismiss (ECF No. 28) is

17   **DENIED** as moot.

18        **IT IS FURTHER RECOMMENDED** that the Government's Motion to Hold Shelton's

19   Motion to Dismiss in Abeyance (ECF No. 32) is **DENIED** as moot.

20

21                         **<u>NOTICE</u>**

22        This report and recommendation is submitted to the United States district judge assigned

23   to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation

24   may file a written objection supported by points and authorities within fourteen days of being

25

26   [26] Although not pertinent to its determination, the Court also finds that the search of the red BMW
     occurred after the search warrant was issued. Though not captured directly by bodycam footage,
27   the search can be seen taking place in the background around 1:53 p.m. And the metadata
     showing that pictures of the search were taken at 1:33 p.m. can be explained by Mr. Dinh's
28   testimony that the camera's programmed time was likely running slow.

1   served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely

2   objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153,

3   1157 (9th Cir. 1991).

4

5        DATED this 15th day of August 2024.

6                                         _____
                                          BRENDA WEKSLER
7                                         UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28